**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

UNITED STATES OF AMERICA,

     v.

RODRIGUEZ RODNEY LOMAX
NORMAN,

       Defendant.

Case No. 1:17-CR-00254-LMB

## <u>DEFENSE MEMORANDUM IN AID OF SENTENCING</u>

Kobie A. Flowers (*pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
1717 K Street, NW, Suite 900
Telephone:  (202) 742-5969
Facsimile:  (202) 742-5948
kflowers@browngold.com

Shalin R. Sood
LECLAIRRYAN
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
(703) 647-5957 Direct
shalin.sood@leclairryan.com

*Attorneys for Rodriguez Norman*

# Table of Contents

INTRODUCTION ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

   I.   A Sentence of 60 months with drug treatment complies with the Guidelines. ................... 5

      A.   For Count One – Conspiracy to Commit Bank and Wire Fraud — the enhancements
      for the role adjustment and the loss amount raise questions. .................................................. 6

      B.   For Count Two – Conspiracy to Traffic in Contraband Cigarettes – the loss amount is
      not specific to Mr. Norman, is unreasonable, and lacks empirical basis. ............................ 10

      C.   Mr. Norman should receive a Downward Departure under U.S.S.G. § 4A1.3(b)
      because his Criminal History Category substantially over represents his criminal record... 12

   II.   A sentence of 60 months imprisonment plus drug treatment is sufficient, but not greater
   than necessary to serve the goals of sentencing under 18 U.S.C. § 3553(a). ........................... 14

      A.   Mr. Norman is greater than the tripartite effect of his time, history, and
      circumstances. ........................................................................................................................ 15

      B.   Finding Just Punishment in the face of very serious crimes. ...................................... 21

      C.   General deterrence principles are ineffective at reducing criminal conduct. ............ 22

      D.   Mr. Norman is unlikely to recidivate. .......................................................................... 24

      E.   A below-the-Guidelines sentence will avoid unwarranted sentencing disparities. .... 24

   III.   Mr. Norman respectfully requests this Court recommend designation to FPC
   Cumberland and participation in the Residential Drug Abuse Program. ................................. 26

CONCLUSION .................................................................................................................... 26

CERTIFICATE OF SERVICE .............................................................................................. 27

TABLE OF EXHIBITS ........................................................................................................ 28

TABLE OF LETTERS ......................................................................................................... 29

TABLE OF PHOTOGRAPHS .............................................................................................. 30

## INTRODUCTION

> I am what time, circumstances, history, have made of me,
> certainly, but I am also, much more than that.  So are we all.
>
> James Baldwin, *Notes of a Native Son*, at xii (Beacon Press 1984)
> (1955).

Rodriguez "Rodney" Norman is what time, circumstances, and history have made of him. But he, like James Baldwin — the great African-American author, activist, and academic — is also so much more.

Mr. Norman spent his formative years in poverty, lived for a time in foster care, and had few adult role models.  Despite this inauspicious start, Mr. Norman entered college at 16, earned a bachelor's degree in social work, and eventually started his own business.  He turned his childhood pain and struggles into motivation to help others by pursuing a career in mental health and supportive services for at-risk youth and adults with mental health disabilities.  As an entrepreneur, Mr. Norman made a point to hire ex-offenders.  He is so much more than what time, circumstances, and history have made of him.

However, Mr. Norman — like all of us — will never be completely free from the clutch of time, circumstances, and history.  Mr. Norman succumbed to the same lures that he cautioned troubled youth against — the easy money and negative influences endemic to fraud and dog-fight gambling.  While Mr. Norman is so much more than what time, circumstances and history have made of him, the Court's first impression of Mr. Norman is of a fraudster and dog-fighting gambler.  But, as Amor Towles explains in his critically acclaimed novel *A Gentleman in Moscow*:

> [W]hat can a first impression tell us about anyone?  Why, not more than a chord can tell us about Beethoven, or a brushstroke about Botticelli.  By their very nature, human beings are so capricious, so complex, so delightfully contradictory, they deserve not only consideration, but our *reconsideration*. . .
>
> Amor Towles, *A Gentleman in Moscow* 120 (2016) (emphasis in the original).

Through this Sentencing Memorandum, undersigned counsel invites this Court to consider — and then *reconsider* — the manner of man that is 31-year old Rodney Norman. Once this Court has considered and then reconsidered the time, circumstances, and history of Mr. Norman, this Court will move past its first impression of Mr. Norman to see that he is so much more than the tripartite effect of time, circumstances, and history.  Once the Court has completed the difficult task of measuring the manner of man, the facts of the case, and the law, this Court should sentence Mr. Norman to 60 months incarceration with drug treatment.  It is the just sentence.

## ARGUMENT

A sentencing court must conduct a three-step analysis to mete out a just sentence. First, the court must correctly determine the defendant's sentence under the Guidelines.  *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.") (internal citations omitted).  The sentencing court should start with the Guidelines calculation "to secure nationwide consistency." *Id.*; *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017).

Second, the sentencing court must consider the parties' 18 U.S.C. § 3553(a) arguments. *Gall*, 552 U.S. at 49-50; *Blue*, 877 F.3d at 517-18.  While the advisory Guidelines should be the

starting point and the initial benchmark, the sentencing court must consider all the factors of 18 U.S.C. § 3553(a).  *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011) (internal citations and quotations omitted).  In considering the 18 U.S.C. § 3553(a) factors, the district court must "impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing." 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also Pepper*, 131 S. Ct. at 1242.  Third, the sentencing court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50; *Blue*, 877 F.3d at 517-18.  "This necessarily means that the sentencing court is free to conclude that the applicable Guidelines range gives too much or too little weight to one or more factors, either as applied in a particular case or *as a matter of policy*." *United States v. Williams*, 517 F.3d 801, 809 (5th Cir. 2008) (emphasis added).  The sentencing court must explain its reasons for the sentence "to allow for meaningful appellate review and to promote the perception of fair sentencing."  *Blue*, 877 F.3d at 518; 18 U.S.C. § 3553(c).  Accordingly, the defense submits this Sentencing Memorandum to aid the Court in this three-step analysis.

## I.    A Sentence of 60 months with drug treatment complies with the Guidelines.

The Guidelines calculation applicable to Counts One and Two of the Indictment result in a sentence that is greater than necessary to meet the goals of sentencing.  Specifically, the calculation for each count (depicted in the tables below) includes significant increases to the base offense levels on the basis of speculative loss amounts and Mr. Norman's presumed leadership role in a broader conspiracy.  The Court should decline to find that Mr. Norman was an organizer or leader in the conspiracy to commit bank and wire fraud (Count One) and the conspiracy to traffic in contraband cigarettes (Count Two).  Likewise, the Court should find that the loss

amounts for Counts One and Two result in offense levels that are unsupported by the record and unreasonably increase Mr. Norman's sentence.

### A. For Count One – Conspiracy to Commit Bank and Wire Fraud — the enhancements for the role adjustment and the loss amount raise questions.

| Guideline | Levels |
| --- | --- |
| Base offense level (§§ 2X1.1(a); 2B1.1(a)(1)) | +7 |
| Loss amount attributable to Norman (greater than $500k, but not more than $1.5M) (§ 2B1.1(b)(1)(H); app. note 3(F)(i)) | +14 (Presentence Report[1] recommends + 16) |
| Offense involved 10 or more victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Offense involved sophisticated means (§ 2B1.1(b)(10)) | +2 |
| Offensive involved the possession or use of device-making equipment or trafficking of any unauthorized access device or counterfeit access device (§ 2B1.1(b)(11)) | +2 |
| Organizer or leader of criminal activity that involved 5 or more participants (§ 3B1.1(a)) | +2 (PSR recommends +4) |
| TOTAL OFFENSE LEVEL (before acceptance of responsibility) | 29 (add downward variance for loss at Court's discretion) |

> 1. *Mr. Norman's was not a "leader" under U.S.S.G. § 3B1.1(a) within the conspiracy because he did less than those who were "supervisors" under U.S.S.G. § 3B1.1(c).*

Mr. Norman objects to the recommendation in the PSR for a four-level enhancement for his purported organizer or leader role within the conspiracy. [2] While Mr. Norman concedes that he supervised some activities of co-defendant Ryan McNeil, whom he treated as a mentee, Mr. Norman never occupied any leadership role akin to co-defendant Travon Williams.  As the Statement of Facts to Mr. Norman's plea agreement makes clear, Mr. Norman's role in the conspiracy was limited to obtaining credit card numbers and purchasing cigarette cartons for

---

[1]  Hereinafter "PSR."
[2]  This argument also applies to Count 2 – Conspiracy to Traffic in Contraband Cigarettes.

resale.  Unlike co-defendant Travon Williams, Mr. Norman only supervised Ryan McNeil.

Travon Williams, however, was responsible for the supervision and management of at least four

individuals, including Denae Horton, Ronnie Beale, Eugene Cuffee, and Gentle Tyson.  These

individuals reported directly to Mr. Williams, who then paid them approximately $10 for each

cigarette carton they purchased using the fraudulent cards.  The lone subordinate of Mr. Norman,

as compared to the four subordinates of Travon Williams, demonstrates that Mr. Norman was

hardly a leader in the conspiracy as contemplated by the Guidelines.

      The government has overstated Mr. Norman's connection to the New York buyer of the

cigarettes.  Certainly, Mr. Norman knew about and met the New York buyer.  But Mr. Norman

also had reason to believe that the cigarettes were sold in places other than New York.  For

example, Nathaneal Williams — who was not assessed a role enhancement for being a "leader,"

*see* PSR ¶ 107 — had "runners in Ohio." PSR ¶ 39.  By contrast, Mr. Norman only had one

runner (Ryan McNeil) in Virginia.  PSR ¶ 106.[3]

      As further evidence of Mr. Norman's limited role in the conspiracy, he did not possess

the same equipment to manufacture fraudulent credit cards as did co-defendant Travon Williams.

Mr. Norman possessed a credit card reader-writer, but he did not own or possess a credit card

printer/embosser.  PSR ¶ 59.  The latter device allows a user to manufacture fraudulent cards by

embossing names and numbers of fictional card holders onto cards.  A credit card reader-writer

merely allows a user to encode a card strip with credit card numbers.

---

[3]  This factual dispute about what Mr. Norman knew about the New York connection has caused
the PSR writer to question — on some level — Mr. Norman's "acceptance of responsibility."
Mr. Norman accepted responsibility by signing his Plea Agreement, attending the December 22,
2017 re-arraignment and telling the Court how sorry he is, and by having undersigned counsel
provide the PSR-writer a February 26, 2018 Letter in which Mr. Norman accepted responsibility
a third time.  For, at least, the fourth time by virtue of this Sentencing Memorandum, Mr.
Norman accepts responsibility for his crimes and actually welcomes telling the Court a fifth time
at sentencing just how contrite he is.

Additionally, Mr. Norman's role did not rise to the same level of Nathaneal Williams, Jamar Johnson, and Marvin Mitchell — all of whom have received a three-level enhancement for being a "supervisor" and not the four-level enhancement given to Mr. Norman and Travon Williams for being "leaders" under U.S.S.G. § 3B1.1.  PSR ¶¶ 105-08.  Both Nathaneal Williams and Jamar Johnson "recruited others to serve as runners."  PSR ¶ 107.  By contrast, Mr. Norman only had one runner — Mr. McNeil.  PSR ¶ 107.[4]  As mentioned, Nathaneal Williams recruited runners from as far as Ohio.  PSR ¶ 39.  But, Mr. Norman only had one runner in Virginia. Supervisor Marvin Mitchell had two named co-defendants as runners in Ebony Coe and Denae Horton.  Yet, Mr. Norman is being called a "leader" in this conspiracy with only one runner.

Accordingly, the Court should decline to find that Mr. Norman's role merits a four-level increase to the base offense level.  Rather, at most, the Court should increase the base offense level by 2 levels to account for Mr. Norman's supervisory role of co-defendant Ryan McNeil.

### 2. *In determining loss, the Court should consider both what the government provided and failed to provide.*

It is axiomatic that the Court must make its own independent Guideline assessment.  *See United States v. Gall*, 552 U.S. 38, 49 (2007).  While both Parties agreed to the loss amount under U.S.S.G. § 2B1.1(b)(1)(H), *see* PSR ¶ 5b., until now only the government has provided this Court with information suggesting that the loss amount should be more.  *See*, *e.g.*, PSR ¶¶ 98, 100, & 102.  In response to the government's provision of information, the PSR author concluded that the loss merits a 16-level increase as opposed to the 14-level increase contemplated by the Parties.  PSR ¶ 118.

In response, the defense provides the following information for the Court's judgment about the correct loss amount attributable to Mr. Norman.  The government failed to put forth

---

[4]  Mr. Norman disputes that he supervised "other runners" as indicated in the PSR.  PSR ¶ 106.

any *specific* evidence demonstrating: (a) the total number of stolen credit cards attributable to Mr. Norman, and (b) that each stolen credit card number was usable and thus properly defined as an "access device" pursuant to 18 U.S.C. § 1029(e).  The PSR writer states "the Government has not provided the Probation Office with specific figures regarding [Mr. Norman's] losses." PSR ¶ 50.  This lack of proof undercuts the 14-level enhancement.  Application Note 3(F)(i) to U.S.S.G. § 2B1.1(b)(1)(H), which pertains to stolen credit cards and access devices, provides that the loss amount includes "any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device."  The Guidelines refer to 18 U.S.C. 1029(e) for the definitions of "access device," "unauthorized access device," and "counterfeit access device."  An access device is defined as "any card, plate, code, account number . . . or other means of account access that can be used alone, or in conjunction with another access device, to obtain money, goods, services, or any other thing of value."  18 U.S.C. § 1029(e)(1).  An unauthorized access device is "any device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3).  Similarly, a counterfeit access device is defined as "any device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." 18 U.S.C. § 1029(e)(2). Unauthorized and counterfeit access devices "are a subset of access devices, and therefore must be capable of obtaining something of value." *United States v. Onyesoh*, 674 F.3d 1157, 1159 (9th Cir. 2012) (holding that "for an unauthorized access device whose usability is not readily apparent, such as an expired credit card number, some proof of usability is required when the defendant does not concede the fact or when the defendant challenges the enhancement"); *cited with approval in United States v. Carter*, 581 Fed. App'x 206 (4th Cir. 2014) (unpublished per curiam).

9

Here, the evidence demonstrates that Mr. Norman obtained credit card numbers from illicit websites with the understanding that several of the credit card numbers would not work. PSR ¶ 57 (stating that Mr. Norman and the co-conspirators knew that some of the purchased stolen credit card numbers would be declined).  The government failed to identify whether any of the credit card numbers were expired or otherwise unable to accept charges, and which of the credit card numbers were capable of obtaining value.  Absent proof that each card number attributable to Mr. Norman meets the definition of "access device," the Court must make its own determination about the loss amount in this case for Mr. Norman.

**B.  For Count Two – Conspiracy to Traffic in Contraband Cigarettes – the loss amount is not specific to Mr. Norman, is unreasonable, and lacks empirical basis.**

| Guideline | Levels |
|---|---|
| Base offense level (§§ 2X1.1(a), 2E4.1; 2T4.1) | **+6 (PSR recommends 18)** |
| Adjustment for role in the offense | **+2 (PSR recommends 4)** |
| TOTAL OFFENSE LEVEL (before acceptance of responsibility) | **8 (PSR recommends 22)** |

*1.   The loss amount is not specific to Mr. Norman.*

Mr. Norman objects to the recommendation in the PSR for a startling 18-point increase in the base offense level for approximately $238,510.50 in tax evaded to New York State and $82,245.00 in tax evaded to New York City.  First, the government has failed to articulate any specific loss amount related to Mr. Norman.  Second, the corresponding 18-level increase for the purported amount of tax evaded is unreasonable and lacks any empirical basis.

The PSR notes that the government has failed to provide any specific figures associated with Mr. Norman's losses regarding Count Two, but given that Mr. Norman "worked closely with [Travon] Williams," Williams's loss amount should be attributed to Mr. Norman.  PSR ¶ 50.  As described above, Mr. Norman did not work closely with Mr. Williams and did not

maintain a leadership role within the conspiracy.  In fact, it was Ashley Howell, who taught

Travon Williams about credit card fraud.  Then, Travon Williams "recruited" Mr. Norman and

others into the fraud scheme.  PSR ¶ 37.  Moreover, the cigarette cartons that the government

seized directly from Mr. Norman were found in in Virginia, not New York, and the PSR notes

that the Virginia tax on cigarettes (30 cents per pack) had been paid at the point of sale.  *See* PSR

¶ 34.  Mr. Norman did not directly sell any cigarette cartons on the black market in New York,

and had no *specific* knowledge (e.g., What store? What price? Who were the buyers?).  As

explained, Mr. Norman had just as much reason to believe the cigarettes were to be sold in Ohio

as in New York.  PSR ¶ 39.  Therefore, New York excise tax—the highest in the nation[5]—

should not apply.  It matters not that Mr. Norman's co-conspirators sold the cigarette cartons to

an individual in New York for resale on the black market, because the Guidelines do not specify

whether intended loss is included in the amount of tax evaded for purposes of sentencing under

the contraband cigarette law.  *See United States v. Mikayelyan*, No. CRIM.A. 5:03CR30023,

2005 WL 1279135, at *6 (W.D. Va. May 26, 2005).

> 2. *The 18-level Guideline increase for loss based on purported New York tax*
>    *evasion is unreasonable and lacks any empirical basis.*

Not only is the 18-level increase weakly supported by the record evidence, the loss table

has been criticized as lacking in any empirical basis and resulting in draconian sentences.  The

sentence range applicable to Count Two is almost exclusively driven by the loss amount,

dwarfing all other factors.  *See* Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Judging*

*Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further*

*Reform*, 102 Iowa L. Rev. 939 (2018); David Debold & Matthew Benjamin, *"Losing Ground"—*

*In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the*

---
5

*Sentencing Guidelines for Fraud and Theft?*, 160 U. Pa. L. Rev. 141, 151 (2011) ("The problem is that loss has taken on a role in the sentence calculation that dwarfs most of the other important factors."); Mark H. Allenbaugh, *"Drawn from nowhere:" A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 25 (2013); *United States v. Schmitz*, 717 F.3d 536, 539- 40 (7th Cir. 2013) (describing defendant's "factor creep" argument, which criticized the Guidelines for increased sentencing ranges for loss amounts in fraud offenses).  Given the government's failure to put forth any specific evidence of the loss amount attributable to Mr. Norman, and the significant increase in the Guidelines that would result, the Court should not apply the 18-level increase pursuant to U.S.S.G. § 2T4.1(G). Alternatively, the Court can apply vary downward significantly since some tax loss is reasonably foreseeable.

### C. Mr. Norman should receive a Downward Departure under U.S.S.G. § 4A1.3(b) because his Criminal History Category substantially over represents his criminal record.

Mr. Norman's criminal history category substantially over-represents his criminal record. As a result, a downward departure pursuant to U.S.S.G. § 4A1.3(b) is appropriate.  The PSR identifies three prior convictions in Mr. Norman's criminal record, three of which were included in the USPO's calculation of Mr. Norman's criminal history score, resulting in a criminal history category II.   PSR ¶¶ 148-50 & 155.  For each conviction in Mr. Norman's record, the sentences were either suspended in whole, or in large part, resulting Mr. Norman never doing longer than two days of imprisonment at any one time.  *See* U.S.S.G. 4A1.2 App. Note 2 ("To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence.").  Significantly, one of Mr. Norman's criminal convictions, which counts as a point under the Guidelines, is a traffic offense.  PSR ¶ 149.  Mr. Norman received a 2008

conviction for reckless driving and failing to wear a safety belt.  The entire 60-day term of imprisonment was suspended for the 2007 conviction.

The PSR also includes a July 17, 2006 drug conviction when Mr. Norman was 19 years old.  PSR ¶ 148.  Mr. Norman was sentenced to a term of probation under Washington, D.C.'s Youth Rehabilitation Act.  Given that the instant offense conduct commenced in the summer of 2015, this conviction almost falls outside of the ten-year window established by the Guidelines, and is thus barely eligible under U.S.S.G. § 4A1.2(e)(2).

The PSR additionally includes a conviction for animal cruelty.  PSR ¶ 150.  This misdemeanor conviction is not like the instant felony conviction for dogfighting.  The former conviction occurred when Mr. Norman was in college and he failed to feed his dogs.  The dogs were not taken from him.  Importantly, the Mr. Norman was not engaged in dogfighting in 2011. *Id.*

Mr. Norman's criminal history is significantly less serious as compared to other defendants in category II.  Mr. Norman has never served any significant term of imprisonment. Given the nature of Mr. Norman's convictions — one of which is a traffic conviction — the Court should depart downward.  *See, e.g.*, *United States v. Summers*, 893 F.2d 63, 67–68 (4th Cir. 1990) (stating that the district court did not act unreasonably by excluding driving offenses from computation of the defendant's criminal history category); *United States v. Nelson*, 166 F. Supp.2d 1091, 1096 (E.D. Va. 2001) (departing downward pursuant to §4A.13(b) because the defendant's minor non-violent offenses and traffic infractions "artificially inflated the seriousness of his prior criminal record").  Accordingly, this Court should depart downward from Category II to Category I.

In sum, even before considering the factors under 18 U.S.C. § 3553(a), Mr. Norman's

Guidelines calculations are:

| | |
|---|---|
| Count 1 (Bank Fraud Conspiracy) | 29 (before Court's discretionary variance) |
| Count 2 (Cigarette Conspiracy) | 8 |
| Count 6 (Agg. ID Theft) | N/A |
| Count 1 (Dogfighting Conspiracy) | 16 |
| Grouping | 29 |
| Acceptance of Responsibility | <u>-3</u> |
| Adjusted Offense Level | 26 |
| Criminal History Category | I |
| Guideline Incarceration time | 63-78 months |
| Total Incarceration time | 87-102 months[6] |

## II.  A sentence of 60 months imprisonment plus drug treatment is sufficient, but not greater than necessary to serve the goals of sentencing under 18 U.S.C. § 3553(a).

A sentencing court is required to consider the factors set forth in § 3553(a) and impose a sentence that is sufficient, but not greater than necessary to serve the goals of sentencing, which include the need for a sentence to reflect the seriousness of the offense, deter criminal conduct, protect the public from further of the defendant's crimes, and provide the defendant with necessary education or vocational training and treatment.  *See* 18 U.S.C. § 3553(a)(2).  The Court must also consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range established by the offense category set forth in the guidelines, any pertinent policy statement, the need to avoid unwarranted sentence disparities, and the need to provide restitution to victims.  *See* 18 U.S.C. § 3553(a).  Application of the relevant § 3553(a) factors to Mr. Norman leans in favor of a below-Guidelines sentence.

---

[6]  Again, this calculation is *before* the Court issues a discretionary variance for Count 1.

**A. Mr. Norman is greater than the tripartite effect of his time, history, and circumstances.**

*1. Mr. Norman's childhood was plagued by instability and disruption.*

Mr. Norman grew up in poverty and had no relationship with his biological father. Mr. Norman's mother worked various jobs when Mr. Norman was a child, but the work was never steady, and his family often moved from apartment to apartment. As the PSR notes, one of Mr. Norman's earliest childhood memories was carrying a sofa on his back during one move when he was approximately 5 or 6 years old. *See* PSR ¶ 165. In particularly hard times, Mr. Norman's family was unable to find a place to live, and he and his siblings were homeless. Mr. Norman's fragile living situation ultimately led to his removal from his mother's home and placement into foster care between the ages of approximately 4 and 7. Mr. Norman was separated from his siblings and lived in foster care for 1–2 years before being reunited with his family. PSR ¶ 164-67.

The transient and unstable nature of Mr. Norman's childhood has had lasting effects on his life. Research has demonstrated that childhood instability threatens "the most basic things children need to flourish: a sense of security, safety, and efficacy in the world; strong relationships with loving adults; a stable environment; and stable access to food, housing, health care, and education." Gina Adams, *et al.*, *Stabilizing Children's Lives: Insights for Research and Action*, Urban Institute, December 2016, https://www.urban.org/sites/default/files/publication/86216/stabilizing_childrens_lives.pdf. Instability is often associated with poor short- and long-term childhood outcomes, including stunted emotional and cognitive development and lasting effects from "toxic stress." *Id.*

A recent study by the Brazilian Journal of Psychiatry found that youth who have experienced traumatic events, or live in poverty, are associated with higher occurrences of

psychiatric disorders, such as depression, anxiety, and attention-deficit hyperactivity disorder. Approximately one-quarter of the 180 adolescents who comprised the study had a psychiatric disorder.  Sixty percent of the adolescents with diagnosed psychiatric disorders had experienced at least one violent event during their lifetime. *See* Thiago M. Fidalgo et al., *Exposure to Violence: Associations with Psychiatric Disorders in Brazilian Youth*, Revisa Brasileira de Psiquiatria (Feb. 15, 2018), http://www.scielo.br/scielo.php?pid=S1516-44462018005002101&script=sci_arttext.

At bottom, trauma and poverty in childhood result in poorer outcomes for black males than their White, Asian, and Hispanic counterparts.  A recently-published study analyzing intergenerational racial and ethnic disparities demonstrates that black children born to parents in the bottom quintile of household income have a mere 2.5% change of rising to the top quintile of household incomes nationwide.  *See* Raj Chetty, *et al.*, *Race and Economic Opportunity in the United States: An Intergenerational Perspective*, The Equality of Opportunity Project, March 2018, http://www.equality-of-opportunity.org/assets/documents/race_paper.pdf.  This study also demonstrates that a startling black-white gap exists even for black boys born to middle- and upper-income households.  Children born into high-income black families have higher rates of downward mobility than whites across generations, demonstrating that education, wealth, and growing up in higher-income neighborhoods do no insulate black boys from poorer outcomes. The study concludes that disparities in black-white upward mobility are the result of environmental factors.  The study further proposes that solutions for narrowing the black-white gap should focus less on short-term policies that improve outcomes of a single generation, like wage increases, and more on initiatives specifically targeting black men, which span economic divides, such as mentoring programs and efforts to reduce racial bias among whites and within

the criminal justice system.  Accordingly, the Court should take into account the empirical

evidence demonstrating the systemic challenges Mr. Norman faced as a poor black male person.

2. *Despite poverty, Mr. Norman became a college-educated entrepreneur.*

In spite of a tumultuous upbringing, Mr. Norman beat the odds by entering college at age

16, embarking on a career in mental health and supportive services, and eventually owning his

own business.  Mr. Norman graduated from Norfolk State University in 2007 with a degree in

social work.  After graduation, Mr. Norman worked with at-risk youth and individuals suffering

from mental health issues.  Mr. Norman has worked with group homes and other care providers

in Washington, D.C, Northern Virginia, and Virginia Beach as, among other things, a mental

health counselor, community outreach worker, and assistant program director.  Mr. Norman also

worked as a substitute teacher with Virginia Beach Public Schools.  PSR ¶¶ 178-187.



Rodney graduating from Norfolk State University

In 2015, Mr. Norman embarked on a new career as an entrepreneur.  Part of his goal was

to give back to his community by providing jobs and opportunities for ex-offenders, many of

whom were unable to find jobs otherwise.  Mr. Norman and his fiancée, Julia Jessie, jointly

formed Versa Traffic Management Group, LLC ("Versa"), a traffic maintenance and management company in Washington, D.C.  Mr. Norman serves as president and part-owner. Versa performs traffic management of vehicles and pedestrians during road closures, road construction, and other road diversions.  Just before his arrest, Mr. Norman completed OSHA's 30-hour Construction Industry Outreach Training Course in an effort to gain more skills for his business.  *See* Ex. 1-11 (Julia Jessie Character Letter).

### 3.  *Mr. Norman is a man who puts the needs of others above his own.*

Mr. Norman is described by friends and family as kind, supportive, and loving.  In the letters to the Court submitted by Mr. Norman's loved ones, several of his family and friends described acts of kindness by Mr. Norman to complete strangers.  Pearl Lockett, a family friend, recalled Mr. Norman providing a hungry neighborhood man with food and treating him with respect.  Ex. 1-13 (Pearl Lockett Character Letter).  Keia Watkins described a story when Mr. Norman encountered a man outside of a shopping center who asked him for spare change. Rather than giving the man money, Mr. Norman invited him to lunch.  Ex. 1-20 (Keia Watkins Character Letter).   Virginia Caraballo, the mother of Mr. Norman's son, described a time when Mr. Norman purchased groceries for a financially-struggling family with young children.  Ex. 1-4 (Virginia Caraballo Character Letter).  Ms. Caraballo also noted that, "Mr. Norman has always embod[ied] the mission of providing service to those in need."

 

Rodney doing his daughter's hair when she was a few months old

Mr. Norman is also a loving father to two children—April Norman, 10 years old, and Rodriguez Rodney Norman, Jr., 6 years old.  Denise Michelle Bain, a friend of nearly 15 years, described Mr. Norman's "foremost ambition in life" as "tak[ing] care of his family and close friends."  Ex. 1-1 (Denise Bain Character Letter).  Coach Randy Millard, a friend and classmate, noted that "Mr. Norman is one of the best fathers I personally know. His passion for fatherhood is insurmountable." Ex. 1-14 (Coach Randy Millard Character Letter).  Mr. Norman's incarceration will not only affect his life, but the lives of his children and family who depend on him.  Mr. Norman's daughter, April Norman, is already struggling with her father's absence from her life.  Ex. 1-16 (April Norman Character Letter).



Rodney with April at Great Wolf Lodge in North Carolina spring break (2016)



Rodney at Rodney Jr.'s kindergarten graduation



Rodney and Rodney, Jr. first day of pre-k

    *4. Mr. Norman takes responsibility for his crimes, which are aberrant, outside of his character, and hurt people and dogs.*

The convictions that bring Mr. Norman before this Court are the first federal felonies that he has ever committed.  He is sorry to the people who he defrauded.  He is sorry for the dogs he hurt.  Mr. Norman has already experienced a painful 31 years.  Now, he walks around with the pain of his victims — both people and dogs.

While Mr. Norman's criminal history includes misdemeanor criminal and traffic offenses, he has never faced convictions of this magnitude.  Mr. Norman's offense conduct was driven by an immense pressure to financially provide for friends and family, who turned to him when they fell on hard times.  As family friend, Joseph Jessie, noted in his letter to the Court, Mr. Norman, "made a terrible mistake trying to provide for a community that needed him more than they realized." *See* Ex. 1-9 (Joseph Jessie Character Letter).

## B.  Finding Just Punishment in the face of very serious crimes.

While Mr. Norman's convictions are serious, they do not warrant the USPO's recommended sentence of 132 to 159 months of incarceration, including the 24 months of consecutive incarceration for the aggravated identity theft charge.  Despite his effort to win his freedom pending trial, Mr. Norman has been incarcerated since August 24 2017.  This has been the first time he has been involuntary isolated from his family, friends, and community.  Moreover, the myriad collateral consequences and social stigma associated with Mr. Norman's convictions — particularly the dog convictions — will follow him for the rest of his life like Hester Prynne's Scarlet Letter.  Mr. Norman must endure the embarrassment, shame, and opprobrium of disappointing the young people he mentored.  Behind bars is where he will now suffer through some of the most important years of his children's lives.  The Court should consider the impact of Mr. Norman's incarceration on his family and consider leniency when

fashioning its sentence.  A significant period of imprisonment only creates an increased risk that Mr. Norman will become "institutionalized."  *See* Craig Haney, "The Psychological Impact of Incarceration: Implications for Post-prison Adjustment," in *Prisoners Once Removed* 33, 39 (Jeremy Travis & Michelle Waul eds., 2003) ("[A]ll other things being equal, the longer persons are incarcerated, the more significant is the nature of their institutional transformation.").  This Court carries the heavy burden of finding a just punishment in the face of very serious crimes — even a crime which stokes the community's passions because dogs are involved.

**C.  General deterrence principles are ineffective at reducing criminal conduct.**

The 3553(a) factors require a sentencing court to consider the need for the sentence imposed to afford adequate deterrence to criminal conduct.  However, research shows more and more that future offenders do not pay attention to the sentences received by defendants when deciding whether to commit their crimes: "[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects," because potential criminals are not aware of penalties and, more importantly, do not believe they will be apprehended and convicted. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).  Just last year, Judge Jack Weinstein of the Eastern District of New York issued an opinion in which he completely rejected general deterrence as a justification for extended incarceration. *United States v. Lawrence*, 254 F. Supp. 3d 441 (E.D.N.Y. 2017). Relying on a defense expert's uncontradicted testimony, he found that "[d]egree of certainty - as opposed to the length and severity - of punishment provides the strongest general deterrence effect." *Id.* at 446.  Judge Weinstein reasoned that

> to be effectively deterred by a sentence in the instant case, future possible offenders would have to have some idea of what sentence was ultimately imposed on [the defendant], appreciate the likelihood of detection and of the federal sentencing guidelines,

22

and engage in a rational cost-benefit analysis. This process is unlikely.

*Id*.  He concluded that

> [t]he sentence must therefore be long enough to encourage anyone who is able to weigh the costs of such actions to avoid [criminal conduct], and to adequately incapacitate [the defendant] to the extent necessary. But, imposing a long incarcerative sentence on him in order to deter future [crime] by members of the community seems futile.

*Id.*

While the Court should not give considerable weight to general deterrence principles in its sentencing analysis, it should consider that the time that Mr. Norman has served since his arrest has already served the goal of specific deterrence.  The approximately 7 months that Mr. Norman has been incarcerated has had a significant impact on his life.  He is committed to rehabilitation.  While incarcerated at the Alexandria Detention Center ("ADC"), Mr. Norman has taken an Interpersonal Communication course through the Open Roads Program at Northern Virginia Community College. *See* Ex. 4 (Life Skills Certificate).  His ADC instructor, Moriah Whiteman, describes Mr. Norman as "an active engager in class," who "relates information he has learned to past experiences and actively shares things he would redo, or could see how they could have gone different [sic]."  Ms. Whiteman concluded that Mr. Norman's intelligence and appetite for learning leads her to believe that he "is capable of amazing things going further." Ex. 1-13 (Moriah Whitman Character Letter).  The conduct that led Mr. Norman to this Court and the time that Mr. Norman has had to reflect on his choices have already imparted life lessons, which make it unlikely that Mr. Norman will engage in similar conduct in the future.  Instead of giving up on life at ADC, Mr. Norman continues to better himself.  Ex. 3 (Public Speaking Certificate from ADC).  Mr. Norman works with ADC Chaplain Contee teaching Life Skills

classes.  He is enrolled in an ADC history class with Mr. Oblinger.  Mr. Norman wants to participate in the Residential Drug and Alcohol Program because it will reduce his sentence and send him home more quickly to his loved ones, but also because he knows he still must confront the drug demons of his past.  This is the Manner of Man this Court must consider when fighting to mete out the right sentence in this case.

### D.  Mr. Norman is unlikely to recidivate.

As the character letters demonstrate, Mr. Norman has a strong network of family and friends.  This support system is critical to Mr. Norman's success post-release.  The Sentencing Commission's research demonstrates that family ties and responsibilities, education, and employment all predict reduced recidivism.  *See* U.S. Sent'g Comm'n, Measuring Recidivism 12-13 (2004); U.S. Sent'g Comm'n, Recidivism and the "First Offender" 8 (2004).  Mr. Norman is fortunate to have the unwavering support of his family, an education, and his own business to return to after he is released.  These circumstances significantly lower the risk that Mr. Norman will recidivate.  *See* Haney at 47 ("The relatively few prisoners who are fortunate enough to leave prison and return to moderately structured and exceptionally supportive environments— stable families, work, helpful forms of parole supervision, and supportive communities—may experience relatively unproblematic transitions.").

### E.  A below-the-Guidelines sentence will avoid unwarranted sentencing disparities.

To avoid sentence disparities, the Court must consider national sentencing trends for defendants who have been convicted of similar conduct.  In 2016, below-Guideline sentences were imposed in 25.3% of all fraud cases.  *See* U.S. Sent'g Comm'n 2016 Sourcebook of Federal Sentencing Statistics, tbl. 27.  Sentences below the Guidelines range have become increasingly common in the post-*Booker* era.  One empirical study noted that by 2012, nearly 70 percent of

defendants in white collar cases in the Southern District of New York received either a government-sponsored or non-government sponsored below-range sentence, suggesting that judges in that district were dissatisfied with the sentencing ranges set forth by the Guidelines. *See* Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale Law Journal 796 (Feb. 2016).  In a separate empirical study of trends in fraud sentencing, statistics demonstrated that even when sentencing courts imposed sentences within the Guidelines, judges frequently imposed the exact bottom of the Guideline range.  *See* Mark W. Bennett, Justin D. Levinson & Koichi Hioki, J*udging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939 (2018).

  In addition to national sentencing trends, the Court should also consider the sentences imposed for Mr. Norman's co-defendants.  Given that Mr. Norman was not an organizer or leader in the conspiracy, his sentence should be considerably less than the sentence of co-defendant Travon Williams.   If the Court simply uses the number of "runners" the co-defendants had as a metric, then Mr. Norman — with just one runner in McNeil — deserves a sentence lower than both Williams defendants, Jamar Johnson, and Marvin Mitchell.  PSR ¶¶ 105-09.

| Co-Defendants | Total Term of Incarceration[7] |
|---|---|
| 1.   Travon Williams | 108 months |
| 2.   Nathaneal Antino Williams[8] | 84 months |
| 3.   Jamar Levell Johnson | 84 months |
| 4.   Ashley Phillip Carrillo Howell | 70 months |
| 5.   Gentle Grant Tyson III | 25 months |
| 6.   Ebony Noel Coe | 25 months |
| 7.   Ronnie Beale | 14 months |
| 8.   Ryan Joseph McNeil | 14 months |
| 9.   Eugene Cuffee | 12 months and 1 day |
| 10. Denae Lee Horton | 60 days |
| 11. Marvin Lee Mitchell | Not yet sentenced |

---

[7]  *See* PSR ¶¶ 8-18.

**III.    Mr. Norman respectfully requests this Court recommend designation to FPC Cumberland and participation in the Residential Drug Abuse Program.**

The defense respectfully requests that the Court recommend that the BOP designate Mr. Norman to the low-security facility at the Federal Prison Camp in Cumberland, Maryland. If that facility is not available, then the defense requests the Federal Medical Center in Lexington, Kentucky. The defense's third option is respectfully the Federal Correctional Institute in Morgantown, West Virginia. In addition, the defense requests that the Court recommend that Mr. Norman be considered for the Residential Drug Abuse Treatment Program and the maximum Residential Reentry Center placement term under the Second Chance Act of 2007. *See* Pub. L. No. 110-199, 122 Stat. 657 (2008).

## CONCLUSION

For the foregoing reasons, a sentence of 60 months with drug treatment comports with Congress' dictate that a sentence be sufficient, but not greater than necessary, James Baldwin's observations that we are all better than the effect of time, history, and circumstances, and Amor Towles' advice that first impressions are to be considered — and then reconsidered.


Respectfully submitted,

Kobie A. Flowers (*pro hac vice*)            Shalin R. Sood
BROWN, GOLDSTEIN & LEVY, LLP           LECLAIRRYAN
1717 K Street, NW, Suite 900                    2318 Mill Road, Suite 1100
Telephone:  (202) 742-5969                       Alexandria, Virginia 22314
Facsimile:  (202) 742-5948                        (703) 647-5957 Direct
kflowers @browngold.com                        shalin.sood@leclairryan.com

                                                               *Attorneys for Rodriguez Norman*


Dated:  March 30, 2018

26

## CERTIFICATE OF SERVICE

I certify that on March 30, 2018 a copy of this Sentencing Memorandum was

served via ECF on all counsel of record.

/s/
Shalin R. Sood
LECLAIRRYAN
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
(703) 647-5957 Direct
shalin.sood@leclairryan.com

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Character Letters |
| 2 | Photographs |
| 3 | Certificate of Participation for Public Speaking Class |
| 4 | Certificate of Participation for Life Skills Class |

**TABLE OF LETTERS**

| Letter No. | Character Letter Author | Exhibit 1 Page Number |
|---|---|---|
| 1 | Bain, Dennis – 14-year friend | 1-1 |
| 2 | Calhoun, Margaret – 16-year friend | 1-3 |
| 3 | Caraballo, Virginia – friend and mother of Rodriguez R. Norman, Jr. | 1-4 |
| 4 | Glover, Danielle – 15-year friend | 1-6 |
| 5 | Glover, Robert – 16-year friend | 1-8 |
| 6 | Jessie, Joseph – friend | 1-9 |
| 7 | Jessie, Julia – fiancé and business partner | 1-11 |
| 8 | Lockett, Pearl – 16-year friend | 1-13 |
| 9 | Millard, Randy – 14-year friend | 1-14 |
| 10 | Norman, April – 10-year old daughter | 1-16 |
| 11 | Paris, Marland – friend and mother of April Norman | 1-18 |
| 12 | Watkins, Keia - friend | 1-20 |
| 13 | Whiteman, Moriah – Open Roads program instructor | 1-21 |
| 14 | Young, Patricia – mother of fiancé | 1-22 |

**TABLE OF PHOTOGRAPHS**

| Letter No. | Description | Exhibit 2 Page Number |
|---|---|---|
| 1 | Rodney and his daughter, April Norman, on the day she was born in May 2007 | 2-1 |
| 2 | Rodney doing his daughter's hair when she was a few months old | 2-2 |
| 3 | Rodney graduating from Norfolk State University | 2-3 |
| 4 | Rodney in football uniform at Norfolk State University in 2008 | 2-4 |
| 5 | Rodney and his daughter April at Achievement Preparatory Academy in Washington, DC (2016) | 2-5 |
| 6 | Rodney with April at Great Wolf Lodge in North Carolina spring break (2016) | 2-6 |
| 7 | April Norman at Achievement Preparatory Academy (2017) | 2-7 |
| 8 | Rodney doing April's hair (2016) | 2-8 |
| 9 | Rodney painting April's nails | 2-9 |
| 10 | Rodney and his son, Rodney, Jr. (2015) | 2-10 |
| 11 | Rodney and Rodney, Jr. at Achievement Preparatory Academy in 2016 | 2-11 |
| 12 | Rodney at Rodney Jr.'s kindergarten graduation | 2-12 |
| 13 | Rodney and Rodney, Jr. first day of pre-k | 2-13 |
| 14 | Rodney visiting his grandmother at the hospital on her birthday (Virginia, July 2015) | 2-14 |
| 15 | Rodney and fiancé, Julia Jessie at Smoky Mountain in Tennessee (February 2014) | 2-15 |
| 16 | Rodney, Rodney's grandmother, Rodney Jr., fiancée- Julia Jessie, nieces and nephews enjoying a day out during spring break | 2-16 |
| 17 | Rodney with his goddaughters in Virginia Beach (Summer 2017) | 2-17 |
| 18 | Rodney and fiancée, Jules Jessie campaigning in 2016 | 2-18 |
| 19 | D.C. Councilman Trayon White and Rodney with his Helping Inner-City Kids Succeed (HICKS) mentees | 2-19 |
| 20 | D.C. Councilman Trayon White, former Mayor Marion Barry and Rodney (2017) | 2-20 |
| 21 | D.C. Councilman Trayon White and Rodney (2017) | 2-21 |

| 22 | Rodney in his role as a community support worker providing support to someone less fortunate | **2-22** |
|----|----|----|
| 23 | Rodney reuniting with his Norfolk State University class mates (Runyon Canyon Park, Los Angeles) | **2-23** |
| 24 | Rodney and good friend, Danielle Glover | **2-24** |
| 25 | Rodney in Panama (2013) | **2-25** |
| 26 | Rodney speaking during his daughter's 10th birthday (Washington, DC) | **2-26** |
| 27 | Rodney and Rodney, Jr. at Georgetown Waterfront Park in 2016 | **2-27** |